PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

GEORGE F. THOMPSON,
            *Plaintiff-Appellant,*

v.                                                    No. 01-2097

POTOMAC ELECTRIC POWER COMPANY,
            *Defendant-Appellee.*

Appeal from the United States District Court
for the District of Maryland, at Greenbelt.
Deborah K. Chasanow, District Judge;
Walter E. Black, Jr., Senior District Judge.
(CA-99-3260-B)

Argued: September 24, 2002

Decided: December 12, 2002

Before LUTTIG and TRAXLER, Circuit Judges, and
Norman K. MOON, United States District Judge for the
Western District of Virginia, sitting by designation.

---

Affirmed by published opinion. Judge Traxler wrote the opinion, in
which Judge Luttig and Judge Moon joined.

---

## COUNSEL

**ARGUED:** Joe Carl Ashworth, Leonardtown, Maryland, for Appel-
lant. William Patrick Flanagan, HOGAN & HARTSON, L.L.P.,
McLean, Virginia, for Appellee. **ON BRIEF:** Dean A. Romhilt,
HOGAN & HARTSON, L.L.P., Washington, D.C., for Appellee.

---

**OPINION**

TRAXLER, Circuit Judge:

George F. Thompson appeals a grant of summary judgment in favor of his former employer, Potomac Electric Power Company ("PEPCO"), on his employment discrimination claims under Title VII and Section 1981. *See* 42 U.S.C.A. §§ 2000e-2(a), 2000e-3(a) (West 1994); 42 U.S.C.A. § 1981 (West 1994). Thompson alleges that PEPCO unlawfully denied him certain training opportunities because of his race and retaliated against him for complaining about PEPCO's allegedly discriminatory conduct. For the reasons set forth below, we affirm.

I.

Thompson, who is African-American, joined PEPCO in 1977 and worked for twenty-three years at the Morgantown Generating Station ("Morgantown") in Newburg, Maryland. During his career at PEPCO, Thompson successfully completed more than eighty training courses, thirty-two of them between 1996 and 1998. He started at the lowest position in his job classification, Power Plant Operator ("PPO") Helper, but steadily advanced through the ranks and was promoted to the highest PPO classification, "A" Operator, in 1994. As an "A" Operator, Thompson worked chiefly in Morgantown's nerve center, the Control Room, operating equipment. During the relevant period, Thompson's immediate supervisor was Robert Chase, a Senior Power Plant Operator ("SPPO") who is also African-American. Chase, in turn, reported to Shift Supervisor Clifford Fluharty, and Fluharty reported to William Hutchins, the General Supervisor of Plant Operations. Both Fluharty and Hutchins are white.

In 1996 and 1997, PEPCO had an unwritten practice of allowing PPOs, like Thompson, to upgrade to SPPO positions on a temporary basis in order to provide cover in the Control Room. Individuals who were temporarily upgraded to SPPO performed chiefly technical duties, but they also directed the work of Control Room operators and thus acquired a modest degree of supervisory experience. They did not, however, perform such supervisory functions as conducting performance appraisals, recommending discipline, or reviewing leave

requests. The duration of upgrades varied and lasted up to one year. Thompson was temporarily upgraded to the SPPO position on one occasion for approximately forty minutes. Two white employees, John Norris and Lester Combs, were upgraded to SPPO positions for lengthier intervals. Norris was also an "A" Operator, but had fewer years of company service than Thompson, and Combs held the lower rated position of "B" Operator. Two other white employees, William Pilkerton and Kim Morris, both "A" Operators senior to Thompson, were never upgraded at all.

Although he never sought additional opportunities for the temporary upgrades, Thompson "thought someone would look at [his] achievements and say, well, let's give [him] a chance." J.A. 44. When specifically approached by Fluharty and asked whether he would like to be upgraded, Thompson responded that he would "try it" so long as he was provided training and the support of a supervisor. J.A. 44. Thompson was encouraged to work alongside Chase in the Control Room, but according to Chase, Thompson did not take advantage of the opportunity.

Thompson applied for a permanent SPPO position in 1997 and 1998. As part of the application process, PEPCO required applicants to complete a First Line Supervisory Assessment Center (the "Assessment Center"), a test comprising six simulation exercises designed to measure the applicant's abilities in various supervisory areas, including communication, problem-solving, judgment, leadership, and interpersonal relations. The simulation exercises were not, however, based on power plant operations. When Thompson participated in the Assessment Center, he was presented with scenarios out of a retail setting. Applicants participating in the Assessment Center received scores ranging from "Best" to "Needs Improvement," with those applicants scoring higher than "Needs Improvement" proceeding to the interview stage. Both times Thompson participated in the Assessment Center he received an overall score of "Needs Improvement." Consequently, Thompson was not selected for either SPPO position. Five other applicants, who had never held supervisory positions or temporary upgrades, scored in the "Acceptable" or "Good" range and proceeded to the next stage.

In 1998, PEPCO underwent a restructuring that included the reclassification of certain positions. As a result, only five of the eight "A"

Operators at Morgantown, selected by seniority, were permitted to continue working primarily in the Control Room and were reclassified as "Control Room Operators." Thompson, who was seventh in seniority, was one of three remaining "A" Operations reclassified as a "Plant Technician" and thereafter worked primarily outside the Control Room. The SPPO position was also reclassified as the "Control Room Supervisor." After the restructuring, Senior Plant Technicians were still permitted to upgrade temporarily to the Control Room Supervisor position. Thompson was again not selected for temporary upgrade; however, two less senior Power Plant Technicians, Ann Shade and Mary Joseph, both African-American, were selected. In June 2000, Thompson was promoted from Plant Technician to "Senior Plant Technician."

According to Thompson, he was not selected for temporary upgrade in retaliation for discrimination complaints he had filed. Thompson first filed an internal complaint of discrimination in December 1996 because he believed that Fluharty had denied him overtime and promotional opportunities because of his race. Thompson also complained after Fluharty called for a disciplinary discussion in June 1997, because Thompson had allegedly raised his voice and pointed his finger at Fluharty in the presence of other employees. Thompson filed another internal discrimination complaint after he was placed on a day of decision-making leave in November 1997 for leaving his watch without authorization. In both instances, Thompson felt that he was treated more harshly than white employees who had committed similar infractions. However, as a result of these disciplinary measures, Thompson lost no pay and maintained the same position. Both incidents were later expunged from his record.

Thompson filed another internal discrimination complaint after receiving his performance evaluation for the period July 1, 1996 to June 30, 1997 (the "1997 evaluation"). For this period, Thompson received a score of one, which corresponded to "Needs Improvement," for the categories "Communicate with Others" and "Work as a Team Member." According to Thompson, his 1997 evaluation marks were lower than those that he had received in the past and were attributable to Fluharty, who oversaw his review and was looking to retaliate for Thompson's complaints. Thompson's overall score for the 1997 evaluation, however, remained "Fully Acceptable" under

PEPCO's performance evaluation standards. In the subsequent two evaluation cycles, when Fluharty was no longer in charge of his review, Thompson's scores improved.

Thompson also complained that he had received threats from co-workers subsequent to filing his first internal discrimination complaint. Specifically, in November 1997, Thompson reported that his name, a box, and the letter "D" had been carved into a workbench near his locker. Thompson asserted that the box represented a coffin and the letter "D" stood for death. PEPCO and local authorities investigated the allegation, but found no evidence to substantiate his claim. Later, in the summer of 2000, a co-worker, Steve Dowart, said, "you've got to go, we're going to get rid of you, we're going to try to do everything we can to get you fired." J.A. 67-68. Thompson told his supervisor and an EEO coordinator about the incident, but did not file a complaint or otherwise pursue the matter.

On June 25, 1999, Thompson filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). After receiving a right to sue letter from the EEOC, Thompson filed a complaint in the district court. He asserted that PEPCO denied him training opportunities and retaliated against him in violation of Title VII and Section 1981. The court granted summary judgment to PEPCO, finding that there were no factual issues warranting a trial. Thompson then filed this appeal.

II.

This court reviews *de novo* a district court's award of summary judgment, viewing the facts and inferences drawn therefrom in the light most favorable to the party opposing the motion. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Lone Star Steakhouse & Saloon, Inc. v. Alpha of Va., Inc.*, 43 F.3d 922, 928 (4th Cir. 1995). As the non-moving party below, Thompson had the ultimate burden of demonstrating a genuine issue of material fact for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Conclusory or speculative allegations do not suffice, nor does a "mere scintilla of evidence" in support of his case. *Phillips v. CSX Transp., Inc.*, 190 F.3d 285, 287 (4th Cir. 1999) (per curiam) (internal quotation marks omitted).

## A. *Denial-of-Training Claim*

We address first Thompson's contention that the district court should not have granted PEPCO summary judgment on his denial-of training claim. Because Thompson presented no direct evidence of discriminatory denial of training based on race, he was obliged to proceed under the *McDonnell Douglas* proof scheme, under which he carried the initial burden of establishing a prima facie case of discrimination. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Evans v. Technologies Applications & Serv. Co.*, 80 F.3d 954, 959 (4th Cir. 1996).[1]

To establish a prima facie case of discriminatory denial of training, a plaintiff must show that: (1) the plaintiff is a member of a protected class; (2) the defendant provided training to its employees; (3) the plaintiff was eligible for the training; and (4) the plaintiff was not provided training under circumstances giving rise to an inference of discrimination. *See Pafford v. Herman*, 148 F.3d 658, 667 (7th Cir. 1998).

When we view the evidence in light of this standard, it is immediately obvious that Thompson has presented no evidence of a denial of training giving rise to an inference that he has suffered discrimination. As the district court noted, Thompson received extensive training during his career at PEPCO, including the period at issue during which he attended some thirty-two courses. We also agree that the temporary upgrades to SPPO were not undertaken as training exercises, but were primarily to provide coverage for absent Control Room operators. Even if we were to treat the temporary upgrades to SPPO as de facto training exercises, Thompson was not denied training under circumstances giving rise to an inference of discrimination, because there is no evidence that similarly situated employees were selected for upgrades on the basis of race. *See Pafford*, 148 F.3d at 667.

---

[1]As an initial matter, we note that the elements required to establish a prima facie case are the same under Title VII and Section 1981; therefore, the district court properly considered these claims together. *See Gairola v. Virginia Dep't of Gen. Servs.*, 753 F.2d 1281, 1285 (4th Cir. 1985).

Thompson contends that the upgrade opportunities afforded to Norris, who was two years his junior in service, and Combs, a "B" Operator, demonstrate that PEPCO did not upgrade him because of his race. However, as the district court properly observed, two other white "A" Operators, Pilkerton and Morris, both senior to Thompson, were denied the opportunity to upgrade altogether. Thompson's argument that Pilkerton and Morris should not be considered because they did not seek temporary upgrades is unavailing because there is no evidence Thompson himself sought upgrades during the relevant period either. The record also indicates that PEPCO did upgrade other similarly situated African-American employees. In particular, after PEPCO reorganized in 1998, two other African-American Power Plant Technicians, Shade and Joseph, were temporarily upgraded to the Control Room Supervisor (formerly the SPPO) position. Shade and Joseph were both junior to Thompson. Because the practice of temporary upgrades remained in effect before and after the reorganization and reclassification of positions, Thompson's argument that only the upgrades afforded to operators prior to the 1998 reorganization should be considered is unavailing.

Consequently, Thompson has failed to demonstrate that PEPCO did not provide him with training under circumstances giving rise to an inference of discrimination. Thus, the district court properly granted summary judgment with respect to Thompson's denial-of-training claim.

## B. *Retaliation Claim*

Thompson also contends that the district court erred in granting PEPCO summary judgment on his retaliation claim. He asserts that PEPCO unlawfully denied him training opportunities, disciplined him, and gave him a lower performance appraisal in retaliation for filing several internal discrimination complaints. Thompson's retaliation claim is also evaluated under the *McDonnell Douglas* framework. *See Karpel v. Inova Health Sys. Servs.*, 134 F.3d 1222, 1228 (4th Cir. 1998).

To establish a prima facie case of retaliation, Thompson was obliged to show that "(1) [he] engaged in a protected activity; (2) [PEPCO] took an adverse employment action against [him]; and (3)

a causal connection existed between the protected activity and the asserted adverse action." *Von Gunten v. Maryland*, 243 F.3d 858, 863 (4th Cir. 2001). It is undisputed that Thompson engaged in protected activity when he filed his internal discrimination complaints. With respect to the second element, this circuit has held that an adverse employment action includes any retaliatory act "if, but only if" that act adversely affected the "terms, conditions, or benefits" of his employment. *Von Gunten*, 243 F.3d at 866 (internal quotation marks omitted). Here, the alleged adverse employment actions were the denial of training opportunities, certain disciplinary actions taken against Thompson, and the 1997 evaluation of Thompson's performance. We consider each in turn.[2]

Thompson argues that the denial of temporary upgrades to SPPO constituted denial of training opportunities which hurt his performance on the Assessment Center evaluations, thereby affecting his ability to be promoted to a permanent SPPO or Control Room Supervisor position. The district court rightly described this argument as "sheer speculation." J.A. 352. As noted previously, the primary role of a temporarily upgraded PPO was to make technical decisions and not to perform traditional supervisory functions. Moreover, temporary upgrade experience did not affect performance at the Assessment Center because the Center judged a participant's abilities in performing general supervisory functions — as witnessed by the role-playing scenarios drawn from the retail, rather than a Control Room, context. Five candidates who scored better than Thompson at the Assessment Center in 1997 and 1998 had never been upgraded or served in any supervisory capacity. Thus, there is no evidence in the record that suggests that upgrades bore any impact on Assessment Center performance.

---

[2]Thompson also claimed that he endured threats from his co-workers. The court below accepted the statement of Thompson's counsel that the threats were not being presented as acts of retaliation, but as evidence of the surrounding circumstances. Inasmuch as Thompson did not rely on these threats in support of his claims or assert a hostile work environment claim below, we do not consider them on appeal. *See Karpel v. Inova Health Sys. Servs.*, 134 F.3d 1222, 1227 (4th Cir. 1998) (holding that employee's failure to raise Title VII hostile work environment claim in district court prevented consideration of claim on appeal).

Even if the denial of temporary upgrades could be considered an adverse employment action, Thompson failed to satisfy the causation element of his prima facie case by showing that the adverse employment action took place after the filing of the discrimination claim. *See Inova*, 134 F.3d at 1229. Thompson asserts that he was denied upgrading opportunities throughout 1996, yet he did not file his first internal discrimination complaint until December of that year. The district court rightly found that the continuation of the alleged adverse action after the filing of a discrimination complaint did not, without more, support Thompson's prima facie burden of showing causation.

Thompson's second allegation of adverse employment action inheres in two incidents: the June 1997 disciplinary discussion prompted because Thompson had allegedly raised his voice and pointed his finger at Fluharty in the Control Room and the November 1997 day of decision-making leave imposed on Thompson for leaving his watch without authorization or relief by a co-worker. In both instances, Thompson felt that he was treated more harshly than white co-workers who had committed similar offenses. PEPCO answered this claim by arguing that neither of these incidents constituted an adverse employment action under *Von Gunten*. We agree. Thompson lost no pay and maintained the same position in the wake of these disciplinary actions, both of which were later expunged from his record. Because Thompson has not demonstrated that any of PEPCO's disciplinary procedures affected the terms, conditions, or benefits of his employment, the district court properly held that he did not establish a prima facie case.

Thompson's remaining adverse action allegation relates to his 1997 evaluation. Although Thompson argues that his appraisal was lower for this period than previous reviews and attributes this to Fluharty's enmity after the filing of discrimination claims, the record indicates that Thompson's overall score for the period, though diminished from earlier evaluations, remained within the "Fully Acceptable" PEPCO rating. The district court correctly noted that the 1997 evaluation therefore did not constitute adverse employment action. *See Von Gunten*, 243 F.3d at 867; *see also Spears v. Missouri Dept. of Corr. & Human Res.*, 210 F.3d 850, 854 (8th Cir. 2000) ("A poor performance rating does not in itself constitute an adverse employment action

because it has no tangible effect upon the recipient's employment . . . [and] is actionable only where the employer subsequently uses the evaluation as a basis to detrimentally alter the terms or conditions of the recipient's employment.") (citation omitted). Because Thompson did not adduce evidence that the appraisal affected the terms, conditions, or benefits of his employment, the court correctly granted PEPCO's motion with respect to Thompson's retaliation claim relating to the 1997 evaluation.

### III.

For the reasons set forth above, we affirm the district court's decision granting summary judgment to PEPCO on Thompson's Title VII and Section 1981 claims.

*AFFIRMED*